## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHELE HAPPY and CHAD GORDON, individually and on behalf of all others similarly situated, | Case No.   1:23-cv-265 |
| Plaintiffs, | CLASS ACTION |
| v. | |
| MARLETTE FUNDING, LLC d/b/a BEST EGG, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Michele Happy and Chad Gordon ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Marlette Funding, LLC ("Defendant"), and allege as follows:

## NATURE OF THE ACTION

1.      Pennsylvania "has a long history, dating back to colonial times, of outlawing annual interest rates above 6%." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 329 (3d Cir. 2022).

2.      That history is codified in two laws: the Loan Interest and Protection Act ("LIPL"); and the Consumer Discount Company Act ("CDCA").

3.      These laws apply to non-bank lenders, and prohibit them from charging, collecting, contracting for, or receiving interest and fees above 6% without a Pennsylvania license. 41 P.S. § 201(a); 7 P.S. § 6203.A.

4.      Marlette is a non-bank that is not licensed under Pennsylvania law, but routinely issues loans to Pennsylvania consumers with rates that exceed Pennsylvania's 6% cap.

5.      Marlette knows this conduct is unlawful, but to make it appear as though the laws applicable to non-banks do not apply, Marlette pays a state-chartered bank—Cross River Bank—to identify itself as the lender of the loans Marlette issues in Pennsylvania.

6.      Other than renting its name to Marlette, Cross River Bank has no real involvement in the loans Marlette makes to Pennsylvania residents.

7.      This is a "rent-a-bank" scheme, and it is unlawful.

8.       These schemes allow lenders "to prey on veterans, seniors, and other unsuspecting borrowers . . . trapping them into a cycle of debt." Remarks by President Biden Signing Three Congressional Review Act Bills into Law: S.J.Res.13; S.J.Res.14; and S.J.Res.15, WhiteHouse.gov (June 30, 2021), *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/06/30/remarks-by-president-biden-signing-three-congressional-review-act-bills-into-law-s-j-res-13-s-j-res-14-and-s-j-res-15/.

9.      Marlette cannot evade Pennsylvania law by having a bank "listed as the nominal lender" on Marlette's loans contracts. *Meade v. Marlette Funding, LLC*, No. 2017-cv-30376, 2018 Colo. Dist. LEXIS 1317, at *53 (Colo. Dist. Ct. Aug. 14, 2018).

10.      This is well-established as a matter of state and federal law.

11.      Plaintiffs bring this action to recover the tens of millions of dollars in overcharges Marlette collectively caused Plaintiffs and thousands of other Pennsylvania residents to pay.

## JURISDICTION

12.      The Court has subject matter jurisdiction. 28 U.S.C. § 1332(d).

13.      Venue is proper in this district. *Id.* § 1391.

14.      The Court has personal jurisdiction because the claims at issue arose in this district and Defendant does substantial business in this district.

## PARTIES

15.   Happy is a person residing in Erie County, Pennsylvania.

16.   Gordon is a person residing in Cambria County, Pennsylvania.

17.   Marlette is a limited liability company headquartered in Wilmington, Delaware.

## USURY REGULATION AND EVASION

*Pennsylvania's Usury Laws*

18.   In Pennsylvania, the maximum rate of interest for loans of $50,000 or less is 6%. 41 P.S. § 201(a).

19.   Non-bank lenders can exceed this rate for loans of $25,000 or less if they obtain a CDCA license. 7 P.S. § 6203.A.

20.   On loans of $25,000 or less, licensed entities can charge up to 24% simple interest. 7 P.S. § 6217.1; *Cash Am. Net of Nev., LLC v. Dep't of Banking ("Cash Am. II")*, 8 A.3d 282, 285-86 (Pa. 2010) ("[I]f a lender is licensed . . . in accord with the CDCA, it can charge between 6-24% on loans under $25,000.").

21.   On loans over $25,000, licensed entities cannot charge above 6% interest. 7 P.S. § 6214.B (prohibiting licensees from charging amounts not authorized by the CDCA); *id.* § 6214.A (permitting licensees to make loans above $25,000, but stating that those loans must comply with the LIPL, which establishes the default 6% cap).

*The Anti-Evasion Principle*

22.   Usury violations usually arise in the context of entities seeking to use some device or process to evade usury laws. *Simpson v. Penn Disc. Corp.*, 5 A.2d 796, 798 (Pa. 1939) ("[U]sury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality[.]"); *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 623-24 (3d Cir. 2009) (quoting

*Cash Am. Net of Nev., LLC v. Dep't of Banking ("Cash Am. I")*, 978 A.2d 1028, 1038 (Pa. Commw. 2009)) (similar).

23.     Evasion is problematic because it undermines the purpose of usury laws. *See Dep't of Banking v. NCAS of Del., LLC ("NCAS I")*, 948 A.2d 752, 761 n. 11 (Pa. 2008) (quoting *Smith v. Mitchell*, 616 A.2d 17, 20 (Pa. Super. 1992)).

24.     Evasion also is difficult to prevent because the devices and processes lenders may create to hide usury "are almost infinitely varied." *Scott v. Lloyd*, 34 U.S. 418, 447 (1835).

25.     To combat the "ingenuity of lenders," and to ensure usury laws would not become "a dead letter," *id.* at 446, courts created the "anti-evasion principle," Adam J. Levitin, *Rent-A-Bank: Bank Partnerships and The Evasion of Usury Laws*, 71 DUKE L.J. 329, 395 (2021).

26.     This is a generally applicable principle intended to apply to any device or process lenders may create to hide usury. *See Hartranft v. Uhlinger*, 8 A. 244, 246 (Pa. 1887) (stating it is "immaterial under what form or pretence usury is concealed, if it can by any means be discovered our courts will refuse to enforce its payment"); *Simpson*, 5 A.2d at 798 ("Wherever the question has arisen the general principle has been approved that parol evidence is always competent to show that a written agreement lawful on its face is in fact usurious."); *Pope v. Marshall*, 4 S.E. 116, 118 (Ga. 1887) ("The theory that a contract will be usurious or not according to the kind of paper-bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous."); *Carter v. Brand*, 1 N.C. 255, 257 (1800) ("Every case arising upon the [law] to restrain excessive usury must be viewed in all its circumstances, so as to ascertain the real intention of the parties. If that be corrupt in the substance and design, no pretext however plausible, no contrivance however specious, no coloring however artful, with which the transaction is veiled, will secure it from the censure of the law.").

27.     The question is whether a particular device or process is "a subterfuge to evade the laws against usury." *Mo., Kan. & Tex. Tr. Co. v. Krumseig*, 172 U.S. 351, 356 (1899).

28.     In answering this question, "courts should closely scrutinize the entire transaction," which means "every part of the transaction must be searched." *Thompson v. Prettyman*, 79 A. 874, 876 (Pa. 1911); *see also Med. Dental Bus. Serv. of N.J., Inc. v. Morrison*, 51 Pa. D. & C. 552, 559 (C.P. Dauphin 1944) (quoting 66 C.J. 174 § 6) ("In [assessing] whether the contract is tainted with usury the court will look to the whole transaction; it will consider the surrounding circumstances, the occurrence at the time of the making of the agreement, and the instruments drawn."); *Melnicoff v. Huber Inv. Co.,* 12 Pa. D. & C. 405, 406 (C.P. Phila. 1929) ("In the investigation of a transaction to determine whether usury has been exacted, the law intends that a search should penetrate through form, device or makeshift to the very substance.").

29.     The point is to determine "the real nature of [a] transaction." *Scott*, 34 U.S. at 446-47; *Simpson*, 5 A.2d at 798.

30.     Historically, courts have applied the anti-evasion principle in a number of contexts, including those where courts were tasked with deciding the real parties in interest to loan contracts. *See, e.g.*, *Richman v. Watkins*, 103 A.2d 688 (Pa. 1954) (upholding a verdict in which a jury found that loan broker husband was the true lender behind a loan in which the wife's name was listed as the lender, and holding that jury could consider extrinsic evidence "to determine whether the use of the name of [the] wife was a mere device resorted to by [the husband] to evade the usury law"); *Gelber v. Kugel's Tavern, Inc.*, 89 A.2d 654, 656-57 (N.J. 1952) (remanding case for jury to decide whether business identified in contract was true debtor, or whether individual that created business was real party in interest); *Walnut Disc. Co. v. Weiss*, 208 A.2d 26 (Pa. Super. 1965) (finding that an alleged corporate loan was really a personal loan made to an individual).

*The "Rent-A-Bank" Device And How It Works*

31.     "Rent-a-bank" refers to a device that online lenders have created to disguise usury.

32.     Through this device, online lenders structure the form of a loan transaction to make it appear as though their loans are issued by banks.

33.     Online lenders structure their loans this way in an attempt to take advantage of the exemption privileges banks enjoy under state law, and the preemption privileges banks enjoy under federal law. *See* 41 P.S. § 406 (exempting banks from LIPL); 7 P.S. § 6217 (exempting banks from CDCA); 12 U.S.C. § 85 (preempting state law with respect to ability of national banks to charge interest); *id.* § 1831d(a) (same with respect to state banks).

34.     Although the "rent-a-bank" device can take many forms, it essentially involves an online lender paying a bank to identify itself as the lender in a contract associated with a loan an online lender created. Levitin, 71 DUKE L.J. at 333.

35.     Other than receiving a fee to put its name on a loan contract, the bank has no real involvement in the loan transaction.

36.     For example, the bank does not offer the online lender's loan product through its branches or websites, the bank does not decide who will obtain the online lender's product, and the bank does not, and never intends to, hold, service, collect, enforce, or otherwise administer the online lender's product.

37.      Instead, the online lender administers its product, decides who will receive it, holds and services its product, and enjoys the profit, and bears the risk of loss, associated with its product.

38.     Despite these facts, online lenders claim the banks named in their loan contracts are the lenders of their loans.

39.     This argument inverts the anti-evasion principle, and asks courts to elevate the form of a loan transaction over its substance.

***The Rent-A-Bank Device Is Unlawful***

40.     The "rent-a-bank" device is an unlawful attempt to evade state usury laws.

41.     Loans made using the "rent-a-bank" device are not bank loans because banks have no real involvement in the loan transaction.

42.     In reality, "rent-a-bank" loans are non-bank loans because non-banks are the "nerve center" of the loan transaction. Levitin, 71 DUKE L.J. at 415.

43.     "[N]o pretext however plausible" can hide this fact. *Carter*, 1 N.C. at 257.

44.     Nor can the "kind of paper-bag" a loan "is put up in." *Pope*, 4 S.E. at 118.

45.     Online lenders do everything associated with "rent-a-bank" loans, other than being listed as the lender in "rent-a-bank" loan contracts.

46.     "Courts of justice would be very stupid if they could not see through so transparent a device to evade the statute, and very feeble if . . . they could not reach it[.]" *Fitzsimons v. Baum*, 44 Pa. 32, 42 (1863).

47.     The majority of courts that have considered the "rent-a-bank" device have found it illegal. *See, e.g.*, *Sanh v. Rise Credit Serv. of Tex., LLC*, No. 20-cv-00310, 2022 U.S. Dist. LEXIS 205214, at *5 (W.D. Wash. Nov. 10, 2022) (finding plaintiff stated claim based on allegation that non-bank paid a bank "for the use of its name"); *Pennsylvania v. Think Fin., Inc.*, No. 14-cv-07139, 2016 U.S. Dist. LEXIS 4649, at *40-41 (E.D. Pa. Jan. 14, 2016) (finding plaintiff stated claim, where non-bank was the alleged true lender, even though bank made and retained interest in loans); *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 W. Va. LEXIS 587, at *39-44 (W. Va. May 30, 2014), *cert. denied*, 575 U.S. 996 (2015) (finding search for entity with "predominant economic

interest" was authorized by state law, which required "search for usury shall not stop at the mere form of the bargains and contracts"); *New York v. Cnty. Bank of Rehoboth Beach, Del.*, 846 N.Y.S. 2d 436 (N.Y. App. Div. 2007) (reversing trial court that found bank was true lender, and instructing court to "examin[e] the totality of the circumstances surrounding [the] . . . business association," where a bank made independent decision to extend credit, and actually issued loans, but non-bank bought majority share in loans and assumed risk of loss); *Eul v. Transworld Sys.*, No. 15-cv-07755, 2017 U.S. Dist. LEXIS 47505, at *24-25 (N.D. Ill. Mar. 30, 2017) (finding plaintiff stated claim where it was alleged that non-bank servicer was "true lender acting behind the scenes," even though loan agreements listed banks as the lenders); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (similar).

48.     This includes the only court that considered the "rent-a-bank" device at issue in this case. *Meade v. Marlette Funding, LLC*, No. 2017-cv-30376, 2018 Colo. Dist. LEXIS 1317, at *53 (Colo. Dist. Ct. Aug. 14, 2018) ("[T]he Court sees no reason . . . why . . . Marlette . . . should be immune from Colorado's . . . law regulating usury, merely by having [a bank] . . . listed as the nominal lender at the outset of a loan.").

49.     It also includes Congress, which recently rescinded a rule issued by the Office of the Comptroller of the Currency ("OCC") that would have elevated the form of loan transactions over their substance and treated national banks as the true lender of loans if a bank initially funded a loan and was named as the lender in the loan agreement. *See* National Banks and Federal Savings Associations as Lenders, 85 Fed. Reg. 68742 (Oct. 30, 2020).

50.     In signing the resolution rescinding the OCC's rule, the President recognized that Congress was "protect[ing] borrowers against predatory lenders," and that online lenders "are kept in check by caps on how much interest they can charge." Remarks by President Biden Signing

Three Congressional Review Act Bills into Law: S.J.Res.13; S.J.Res.14; and S.J.Res.15, WhiteHouse.gov (June 30, 2021), *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/06/30/remarks-by-president-biden-signing-three-congressional-review-act-bills-into-law-s-j-res-13-s-j-res-14-and-s-j-res-15/.

51.     Additionally, the Federal Deposit Insurance Corporation ("FDIC"), which regulates the state bank that rented its name to Marlette for use in Marlette's loan contracts, disfavors "rent-a-bank" arrangements. Federal Interest Rate Authority ("*FDIC Comments*"), 85 Fed. Reg. 44146, 44146-47 (July 22, 2020) ("[T]he FDIC continues to support the position that it will view unfavorably entities that partner with a State bank with the sole goal of evading a lower interest rate established under [state] law[.]").[1]

52.     In short, the "rent-a-bank" device is simply the newest contrivance that lenders have developed to charge borrowers more money.

53.     As explained below, Marlette employed that device to charge tens of thousands of Pennsylvania residents tens of millions of dollars in unlawful interest and fees.

---

[1] The FDIC has issued a rule stating banks may sell their right to charge interest on validly issued state bank loans, but this rule does not determine whether a loan was validly made, *i.e.*, whether it was issued by a bank or non-bank. *Id.* at 44153 ("[T]he text of the proposed regulation cannot be reasonably interpreted to foreclose true lender claims."). Indeed, the rule is not intended to apply when there is a question as to who actually issued a loan. *Id.* at 44152 ("In many cases, there is no dispute that a loan was made by a bank. For example, there may not even be a non-bank involved in making the loan. The [R]ule would provide important clarification on the application of [§ 27 of the FDIA] in such cases[.]"). State law determines that question. *See* Alan S. Kaplinsky, FDIC Questions its Authority to Issue "True Lender" Rule, Consumer Finance Monitor (Dec. 9, 2020), *available at* https://www.consumerfinancemonitor.com/2020/12/09/fdic-questions-its-authority-to-issue-true-lender-rule/ (quoting the Deputy to the FDIC Chairman) ("[S]tate law controls when a loan is made by a state bank and the FDIC cannot preempt state law on this issue."). Moreover, the FDIC rule was issued to stabilize the domestic markets for bank loans, and to ensure the FDIC can manage bank failures. *FDIC Comments*, 85 Fed. Reg. at 44149. Neither concern is implicated in "rent-a-bank" schemes because loans made through the "rent-a-bank" device are never intended to be placed on the market, and are never intended to be held, serviced, administered, collected, or enforced by a bank.

## FACTUAL ALLEGATIONS

*Marlette's Rent-A-Bank Scheme*

54.     In an attempt to evade Pennsylvania usury laws, Marlette has created and employed a "rent-a-bank" scheme to hide the true nature of its loans.

55.     Marlette employed this device to issue "Best Egg" branded loans.

56.     Marlette created this credit product, owns the intellectual property associated with this product, and exclusively offers this product through its website: www.bestegg.com.

57.     When consumers visit that website, Marlette evaluates their credit information and decides whether to issue them a loan.

58.     If Marlette decides they are eligible for a loan, Marlette offers the consumer specific loan terms for a "Best Egg" branded loan.

59.     If the consumer accepts those terms, Marlette inputs those terms into an agreement, and instructs a state-chartered, FDIC-insured bank—Cross River Bank—to fund the loan.

60.     Two days later, the bank sells the loan directly to Marlette, or indirectly to a non-bank designee that Marlette created and controls.

61.     Marlette then services the loan, collects the payments, and receives the interest and fees charged on the loan.

62.     Marlette also enjoys the profit if a loan is repaid and bears the risk of loss if a loan defaults.

63.     Marlette advertises, markets, solicits, underwrites, services, administers, collects, and enforces the Best Egg loan product.

64.     Cross River Bank, by contrast, has no real involvement in the loan, other than listing itself as the lender and receiving a fee for use of its name.

***Marlette Overcharged Plaintiff And Thousands Of Class Members***

65.     In removing a similar class action suit to federal court in 2021, Marlette stated that it overcharged at least 24,000 Pennsylvanians $30,000,000 of interest and fees above the LIPL and CDCA's default 6% cap. *See Henry v. Marlette Funding, LLC d/b/a Best Egg*, No. 21-cv-00985, Doc. 1 ¶¶ 13-15 (W.D. Pa. July 26, 2021).

66.     Happy and Gordon are two of the Pennsylvanians that were overcharged.

67.     On April 21, 2022, Happy obtained a "Best Egg" branded loan.

68.     She visited www.bestegg.com to do so.

69.     After she entered her personal information, Marlette evaluated her creditworthiness and decided to issue her a loan.

70.     Marlette then held her loan and collected all of her payments.

71.     Happy's loan was issued in the amount of $47,005.00.

72.     Marlette also charged Happy a $2,995.00 origination fee.

73.     Marlette then applied a 15.98% interest rate to the combined $50,000.00 balance of the $47,005.00 loan and the $2,995.00 origination fee.

74.     Happy made thirteen payments on her loan: twelve payments of $1,215.37; and a thirteenth payment of $43,471.77.

75.     In total, it cost Happy over $58,000 to pay off a $47,005 loan in thirteen months.

76.     That yields an annual percentage rate around 22%.

77.     Had Marlette charged Happy interest at the legal rate of 6%, it would have cost less than $50,000 for Happy to repay her loan in thirteen months.

78.     Accordingly, Marlette's overcharges caused Happy to pay at least $8,000 over the legal rate.

79.     Moreover, had Happy failed to repay her loan early, and had she repaid her loan in accordance with Marlette's five-year repayment schedule, it would have cost Happy over $72,000 to repay a $47,005 loan.

80.     Repaying a $47,005 loan at a 6% rate over that same time period would, in contrast, cost just over $52,000.

81.     Accordingly, had Happy repaid the loan according to the terms Marlette proposed, she would have paid at least $20,000 over the legal rate.

82.     With respect to Gordon, he received three loans from Marlette: one for $4,713.00, one for $3,157.00, and one for $3,000.00.

83.     Gordon was charged origination fees on all three loans, and Marlette applied rates of 11.4% (to the $4,713.00 and $3,157.00 loan) and 12.8% (to the $3,000.00 loan) to the combined principle and origination fee balance.

84.     Gordon's loans were paid off early (he repaid the $4,713 loan in five months, the $3,157 loan in 6 months, and the $3,000 loan in 1 month), so the effective annual percentage rates on his loans were much higher than the interest rates Marlette charged.

85.     In total, Happy and Gordon paid tens of thousands of dollars more in interest than they should have paid.

***Marlette's Conduct Is Unlawful***

86.     Marlette is not a bank and is not licensed under Pennsylvania law.

87.     Marlette, therefore, could not charge, collect, contract for, or receive more than 6% interest from Plaintiffs or any other Pennsylvania resident. 41 P.S. § 201(a); 7 P.S. § 6203.A.

88.     Marlette knows its conduct is unlawful, which is why Marlette paid a bank to use its name in Marlette's loan agreement.

89.     Marlette cannot evade Pennsylvania law through this device because the substance of the Best Egg loan transaction supersedes its form, and the substance of that transaction is plainly unlawful.

90.     Indeed, Marlette is the real party in interest to Best Egg loan transactions because Marlette is the "mastermind" behind these transactions. Levitin, 71 DUKE L.J. at 415.

91.     There is no reason why Marlette should be immune from Pennsylvania's usury laws "merely by having Cross River . . . listed as the nominal lender at the outset of a loan." *Meade*, 2018 Colo. Dist. LEXIS 1317, at *53.

92.     Marlette cannot evade Pennsylvania law through the "rent-a-bank" device.[2]

***Marlette's Conduct Caused Significant Monetary Losses***

93.     Marlette's actions make loans very expensive, increase the risk of default, and make the consequences of default much worse.

94.     Initially, Marlette's loans are more costly than they otherwise should be.

---

[2] As explained above, this is well-established as a matter of Pennsylvania law. *See* ¶¶ 18-53, *supra*. It also is well established as a matter of federal law. Since before the Civil War, the Supreme Court has recognized the "anti-evasion principle," and has required courts to evaluate the substance of loan transactions, and disregard their form, to determine "the real nature of the transaction." *Scott*, 34 U.S. at 446-47; *Krumseig*, 172 U.S. at 356. After the Supreme Court recognized this common law doctrine, Congress passed two banking laws: the National Bank Act ("NBA"), which regulates national banks; and the Federal Deposit Insurance Act ("FDIA"), which regulates state banks. *See* 12 U.S.C. §§ 85, 1831d. These statutes must be read to adopt common law doctrines, unless they "'speak directly' to the question addressed by the common law." *U.S. v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)). Neither law speaks directly to the "anti-evasion principle," which means they adopted that principle. *See* 12 U.S.C. §§ 85, 1831d. Additionally, courts in New Jersey, the state where the bank that rented its charter to Marlette is located, have applied the "anti-evasion principle" for at least one hundred years. *See, e.g., Rosenbusch v. Frey*, 136 A. 711, 711 (N.J. Dist. Ct. 1927) ("The law . . . regards the essential nature of the transaction, not the incidents created to give it a fictitious color."). In recognizing the "anti-evasion principle" over seventy years ago, the New Jersey Supreme Court found that it could be used to determine the real parties in interest to loan contracts. *See Gelber*, 89 A.2d at 656-57 (remanding case for jury to apply the doctrine to determine whether business identified in contract was true debtor).

95.     Rather than charge the legal rate of 6%, Marlette charges double-digit interest rates and large, upfront origination fees.

96.     Marlette's interest and fees can yield annual percentage rates that reach up to 36% for three- and five-year loans, but Marlette's interest and fees can yield annual percentage rates that are even higher when loans are paid off early.

97.     This results in very expensive loans that take money that could be used for families, could be spent in the local community, or could be used for basic necessities, and redistributes that money to a large, out-of-state lender solely for profit.

98.     It also results in increased default rates.

99.     Repaying loans with double-digit APRs is difficult.

100.    This is especially true when the loan principle is large.

101.    Indeed, some consumers are forced to come up with thousands of extra dollars each year to avoid defaulting on Marlette's loans, and tens of thousands of more dollars over the life of a loan to avoid default.

102.    Many consumers are unable to do so, which results in Marlette defaulting them and selling their loans to debt buyers, who then use the Pennsylvania court system to collect Marlette's loans and sue consumers for the unlawful interest and fees they could not repay.

103.    And due to Marlette's high interest rates, the consequences of default are far worse than they otherwise would have been.

104.    The interest on Marlette's loans is front loaded, meaning initial payments go mostly to interest rather than principle.

105.    On top of that, Marlette imposes large, upfront origination fees that are folded into the principle of Marlette's loans.

106.    So, when consumers default, their principal balance is much higher than it should have been, and they owe substantially more than they otherwise would have owed.

107.    Similarly, when a loan is in default, interest continues to accumulate, which further increases the balance owed.

108.    Marlette's actions have caused and continue to cause substantial monetary losses to Pennsylvania consumers by making their loans more costly, increasing their chances of default, and making the consequences of default far worse.

**Marlette Cannot Avoid Liability By Seeking To Compel Arbitration**

109.    Marlette will likely try to compel this case to arbitration by seeking to enforce an arbitration clause in agreements Marlette placed in hyperlinks in its online application process, but neither Happy nor Gordon assented to arbitrate their claims.

110.    In Pennsylvania, online arbitration contracts can be formed only if: (1) registration pages contain an explicit statement "that a consumer is waiving a right to a jury trial when they agree to [a] company's 'terms and conditions;'" and (2) the contracts available through hyperlinks include a warning that a consumer is waiving their right to a jury trial "at the top of the first page in bold, capitalized text." *Chilutti v. Uber Techs., Inc.*, No. 1023 EDA 2021, 2023 PA Super 126, 2023 Pa. Super. LEXIS 314, at *40-41 (Pa. Super. July 19, 2023).

111.    That did not occur here.

112.    On information and belief, Marlette's registration pages do not contain an explicit statement that a consumer is waiving their right to a jury trial by obtaining a loan or by agreeing to any contracts. *See Henry v. Marlette Funding, LLC d/b/a Best Egg*, No. 2:21-cv-00985, Doc. 35-1 ¶ 6 (W.D. Pa. May 27, 2022) (displaying registration page that does not contain warning of jury trial waiver); *id.* at Doc. 35-3 (same).

113.    Further, on information and belief, the contracts that contained an arbitration clause and were placed in hyperlinks in Marlette's online application process, did not include a statement at the top of their first pages explaining that Happy or Gordon were waiving their right to a jury trial. *See id.* at Doc. 35-2.

114.    Accordingly, neither Happy nor Gordon assented to arbitrate their claims.

115.    Consequently, Marlette cannot compel arbitration in this case.

## CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this action individually and on behalf of all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

117.    Plaintiffs seek to certify a class of: "All persons who, within the applicable statute of limitations, were issued a Best Egg loan and paid interest, fees, or any amount above principle in excess of 6% simple interest per year."

118.    Plaintiffs reserve the right to expand, narrow, or otherwise modify the class as litigation continues and discovery proceeds.

119.    <u>Numerosity and Ascertainability:</u> The class is so numerous that joinder of the class members is impracticable. According to Marlette, there are thousands of class members. The class members can be ascertained by reviewing records held by Marlette.

120.    <u>Commonality and Predominance:</u> Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to the question of whether Marlette could charge, collect, contract for, or receive interest and fees that aggregate in excess of the rates and amounts set forth in the LIPL or CDCA. This question, and other common questions of law and fact, predominate over any individual issues.

121.    <u>Typicality:</u> Plaintiffs' claims are typical of the claims of the class since Plaintiffs' claims are based on the same legal theories and arise from the same conduct.

122.    <u>Adequacy:</u> Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and the class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

123.    <u>Superiority:</u> Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the class may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class members. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale. Since each of the claims of the class members is substantially identical, and the class members request substantially similar relief, centralizing the class members' claims in a single proceeding likely is the most manageable litigation method available.

**<u>COUNT I</u>**
**Violation of the Unfair Trade Practices and Consumer Protection Law**
**73 P.S. §§ 201,** ***et seq.***

124.    This claim is brought individually and on behalf of the class.

125.    Plaintiffs, the class members, and Defendant are persons, the loans at issue were used to buy goods or services for personal, family, and/or household use, and Defendant's conduct is trade or commerce under the UTPCPL. 73 P.S. §§ 201-2(2)-(3), 201-9.2.

126.    The conduct at issue in this case constitutes unfair methods of competition or unfair or deceptive acts or practices under the UTPCPL because Defendant: caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services; caused a likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another; represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they did not have; and engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. *Id.* §§ 201-2(4)(ii), 201-2(4)(iii), 201-2(4)(v), 201-2(4)(xxi).

127.    More specifically, Defendant's conduct is unfair or deceptive because, among other things, Defendant is the true lender of Best Egg loans, and those loans are issued by a non-bank, despite Defendant's representations to the contrary, Defendant's loans are offered at an excessive rate and Defendant's loans are not lawful, despite Defendant's implications to the contrary, and Defendant cannot charge, collect, contract for, or receive the interest and fees Defendant charged, despite Defendant's implications to the contrary. *Dep't of Banking v. NCAS of Del., LLC ("NCAS II")*, 995 A.2d 422, 442-44 (Pa. Cmwlth. 2010) (finding claim for relief stated under the UTPCPL where complaint alleged that a payday lender "offer[ed] a line of credit product . . . at an excessive rate of interest").

128.    Defendant's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce violates 73 P.S. § 201-3.

129.    Plaintiffs and the class members lost money or property as a result of Defendant's violations and therefore are entitled to actual damages, statutory damages, treble damages, and all other available relief under 73 P.S. § 201-9.2, as well as reasonable costs and attorneys' fees, and such additional relief the Court deems necessary or proper.

<u>**COUNT II**</u>
**Violation of the Loan Interest and Protection Law**
**41 P.S. §§ 101, *et seq.***

130.     This claim is brought individually and on behalf of the class.

131.     Plaintiffs and the class members are persons who paid a rate of interest in excess of that provided for by the LIPL and CDCA, and who paid charges prohibited or in excess of those allowed by the LIPL and CDCA.

132.     Defendant collected from Plaintiffs and the class members interest in excess of that provided for by the LIPL and CDCA, and charges prohibited or in excess of those allowed by the LIPL and CDCA.

133.     The LIPL provides for, among other things, damages, declaratory and injunctive relief, and attorneys' fees and costs. 41 P.S. §§ 501, 502, 503.

134.     Accordingly, the Court should issue an order: awarding any excess interest, fees, or other charges collected by Defendant; awarding triple the amount of any excess interest, fees, or other charges collected by Defendant; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

<u>**COUNT III**</u>
**Violation of the Consumer Discount Company Act**
**7 P.S. §§ 6201, *et seq.***

135.     This claim is brought individually and on behalf of the class.

136.     Defendant is in the business of negotiating, making, or arranging loans or advances, is not a bank, and is not licensed under the CDCA or any other Pennsylvania statute.

137.     Consequently, Defendant could not charge, collect, contract for, or receive more than 6% combined interest, fees, or other charges on loans or advances issued in amounts under $25,000. 7 P.S. § 6203; 41 P.S. § 201(a).

138.     Defendant, however, charged, collected, contracted for, or received interest, fees, or other charges above this amount.

139.     Equitable relief is available to private parties under the CDCA. *Mellish v. CACH, LLC*, No. 19-cv-01217, 2020 U.S. Dist. LEXIS 52383, at *7 (W.D. Pa. Mar. 26, 2020) ("If a private civil litigant seeks enforcement of the CDCA, the available remedy is equitable[.]").

140.     Aside from that, the collection of charges prohibited by the CDCA is actionable in equity under common law theories like unjust enrichment, and is independently actionable under the LIPL. *See, e.g.*, *Daye v. Cmty. Fin. Loan Serv. Ctrs., LLC*, 280 F. Supp. 3d 1222, 1257 (D.N.M. 2017) (finding plaintiff could recover payments on loan pursuant to unjust enrichment theory, even though usury statute provided no private cause of action); Restatement (Third) of Restitution and Unjust Enrichment § 32, ill. 1 (similar); *Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 825 (Pa. 2013) (holding that § 502 of the LIPL provides a cause of action to challenge the legality of costs tied to loans or the use of money).

141.     Accordingly, the Court should issue an order: awarding restitution in the amount of any interest, fees, or other charges that Defendant charged, collected, contracted for, or received in excess of 6%; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs request a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.       An order certifying the proposed class, appointing Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b.      An order awarding actual, statutory, treble, and all other damages available by law, along with pre- and post-judgment interest;

c.      An order awarding restitution for all overcharges;

d.      An order awarding attorneys' fees and costs;

e.      An order declaring Defendant's conduct unlawful; and

f.      An order awarding all other relief the court finds is just, equitable, and appropriate.

Respectfully submitted,

Dated: September 6, 2023              By:    */s/ Kevin Abramowicz*
Kevin Abramowicz
Kevin W. Tucker
Chandler Steiger
Stephanie Moore
**East End Trial Group LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel: (412) 223-5740
Fax: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com

*Attorneys for Plaintiffs*